IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| EDDIE IRA SANDERS, SR., )<br>as Administrator of the Estate of )<br>Eddie Ira Sanders, Jr., Deceased, )<br>    )<br>    Plaintiff, )<br>v. )     CASE NO. 1:07-cv-008-MEF<br>    )<br>CITY OF DOTHAN, *et al.*, )     (WO—Publish)<br>    )<br>    Defendants. ) | |

## **MEMORANDUM OPINION AND ORDER**

### I. INTRODUCTION

Plaintiff Eddie Ira Sanders Sr. ("Sanders Sr.") brought this action on behalf of the estate of his son, Eddie Ira Sanders Jr. ("Sanders Jr."), against Police Officer Maurice Eggleston ("Eggleston") and his employer, the City of Dothan ("the City"). Sanders Sr. alleges that Eggleston, when he arrested Sanders Jr. for drug and traffic offenses, violated two of Sanders Jr.'s constitutional rights. First, he claims that Eggleston used excessive force, in violation of the Fourth Amendment. Second, he claims that Eggleston was deliberately indifferent to Sanders Jr.'s serious medical needs at the time of his arrest, in violation of the Fourteenth Amendment. Sanders Jr. died shortly after the arrest, and Sanders Sr. now seeks a declaratory judgment, injunctive relief, and compensatory and punitive damages under 42 U.S.C. § 1983 and Alabama tort law.

This cause is before the Court on the defendants' Motion for Summary Judgment, filed on August 14, 2009. (Doc. # 68.) For the following reasons, the defendants' motion will be GRANTED in part and DENIED in part.

## II.  JURISDICTION AND VENUE

This Court has subject-matter jurisdiction over this case under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 1367 (supplemental).  The parties do not contest personal jurisdiction, and venue is proper under 28 U.S.C. § 1391.

## III.  RELEVANT FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and opposition to the motion.  Under the summary-judgment standard, the Court must set out the facts in the light most favorable to Sanders Sr., the nonmoving party.[1]  *Hope v. Pelzer*, 536 U.S. 730, 733 n.1 (2002).  As the Eleventh Circuit has noted, "the 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case."  *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 925 n.3 (11th Cir. 2000).  The submissions establish the following facts for summary-judgment purposes:

On the evening of August 24, 2005, Eggleston, a police officer assigned to the Dothan Police Department's patrol division, attempted to pull over Sanders Jr. for driving a car with a burnt-out tag light.  But Sanders Jr. did not stop, so Eggleston turned on his patrol car's emergency lights and siren and gave chase.  After a two-minute pursuit, in which Sanders Jr. violated multiple traffic laws and almost caused a collision, Sanders Jr. finally pulled his car over to the side of the road.

---

[1] As the Supreme Court recognized in *Scott v. Harris*, 550 U.S. 372 (2007), the requirement that the court view all facts and draw all reasonable inference in favor of the nonmoving party typically means adopting the plaintiff's version of the facts in a qualified-immunity case.  Nonetheless, in this case, as in *Scott*, the Court has the benefit of viewing and listening to the video and audio recordings from the dashboard cameras in the officers' patrol cars.  Therefore, to the extent Sanders Sr.'s version of the facts is clearly contradicted by these recordings, such that no reasonable jury would believe it, this Court does not adopt his factual allegations.

Eggleston parked, exited his patrol car, and started to walk toward Sanders Jr.'s car. But Sanders Jr., a large man who stood over 6 feet tall and weighed more than 400 pounds, jumped out of his car as well. Eggleston ordered Sanders Jr. to show his hands and get on the ground. Sanders Jr. did not get on the ground. Instead, he turned around, went back to his car, knelt down in front of the drivers-side door, and reached into the car. After several seconds, Sanders Jr. put his hands above his head, stood back up, and turned around to face Eggleston. He turned his back on Eggleston for a second time and, after a few seconds, put his hands on top of his car.[2] Sanders Jr. then turned to face Eggleston, took his hands off of the top of his car, and started to walk towards Eggleston. Because Eggleston did not know what Sanders Jr. had reached for in the car, he immediately retreated behind his patrol car, drew his firearm, and again ordered Sanders Jr. to get on the ground. This time, Sanders Jr. complied, and after switching out the firearm for a taser, Eggleston handcuffed Sanders Jr. in front of the patrol car.[3]

Eggleston then examined the inside of Sanders Jr.'s car and noticed a substance that he suspected was cocaine. After radioing for a K-9 unit to come to the scene to investigate, Eggleston returned to Sanders Jr. and helped him to his feet. Eggleston asked Sanders Jr. if he had any weapons or drugs on his person. Sanders Jr. said he did not. Eggleston asked him

---

[2] Sanders Sr. argues that Sanders Jr. put his hands up to his face and mouth sometime after he stood back up. But this fact is not supported by the recording from Eggleston's patrol car, although Sanders Jr. may have put his hands up to his face and mouth after he turned his back to Eggleston for the second time. Nonetheless, according to his deposition, Eggleston does not remember seeing Sanders Jr. put his hands up to his face at the time. In addition, there is no evidence in the record that proves that Sanders Jr. put anything in his mouth or that Eggleston knew that Sanders Jr. put anything in his mouth.

[3] The defendants claim that Sanders Jr. resisted arrest when Eggleston handcuffed him. But Sanders Sr. disagrees, and the recording is not conclusive one way or the other. Thus, the Court will credit Sanders Sr.'s version of the facts.

3

if he had any weapons or drugs in his car.  Again, he said he did not.  During this colloquy, Sanders Jr. talked normally and did not appear to have anything in his mouth.  Eggleston also conducted a pat-down search before putting Sanders Jr. in the back of the patrol car. Eggleston did not find any weapons or drugs on him.

Other police officers arrived on the scene.  They too suspected that the substance in Sanders Jr.'s car was "rock" cocaine.  One of these officers, Ronald Hall, leaned into Eggleston's patrol car to interrogate Sanders Jr.  During the interrogation, Hall noticed that Sanders Jr. had several white flakes in his beard, and he pointed them out to Eggleston.  Both officers knew from experience that suspects often conceal contraband and other evidence in their mouths.  Consequently, both Hall and Eggleston ordered Sanders Jr. to open his mouth several times.  Sanders Jr. opened his mouth, but he refused to give either officer an unobstructed look inside.  Each time, he either refused to lift his tongue, looked down, or turned his head away from the officers.

Hall then retrieved a drug swab from his patrol car and wiped off some of the white flakes from Sanders Jr.'s beard.  He took them back to his patrol car to test them.  In the meantime, Eggleston, growing impatient with Sanders Jr.'s continued disobedience, leaned into the patrol car, drew his taser, removed the taser cartridge containing the probes, and told Sanders Jr. that if he did not comply with the order to open his mouth, he would use the taser on him.  Still, Sanders Jr. refused to cooperate, and after giving Sanders Jr. several more warnings and ample time to comply, Eggleston used his taser on Sanders Jr. in drive-stun mode for approximately one to two seconds.  Sanders Jr. immediately opened his mouth and

4

lifted his tongue so that Eggleston could see inside. Eggleston did not see anything in Sanders Jr.'s mouth.[4]

Hall reported back that the white flakes in Sanders Jr.'s beard had tested positive for cocaine. The officers asked Sanders Jr. if had swallowed cocaine. He denied swallowing cocaine. The officers again asked Sanders Jr. if he had swallowed cocaine, pointing out that they needed to know for his safety and because they would need to take him to get his stomach pumped if he had swallowed cocaine. Sanders Jr. denied swallowing cocaine for a second time. The officers tried again, this time telling Sanders Jr. that they knew he had swallowed cocaine and that they were going to take him to get his stomach pumped. Sanders Jr. denied swallowing cocaine for a third time, and he pleaded with the officers not to take him to get his stomach pumped. By then, a K-9 unit had arrived on the scene and identified Sanders Jr.'s car as containing illicit drugs. Eggleston and Hall discussed whether it would be a good idea to take Sanders Jr. to the hospital to get his stomach pumped because they did not know how much cocaine he had swallowed.[5] They never reached a decision.

Eggleston went back to Sanders Jr. and asked him several routine questions in order to fill out a few police reports. All of the officers on the scene who interacted with Sanders Jr. agree that he showed no signs of impairment or intoxication. His eyes were not dilated,

---

[4] Eggleston does not believe that Sanders Jr. swallowed anything because he did not see Sanders Jr. take a gulp. But a report Eggleston authored after the incident states that, as Eggleston used the taser, Sanders Jr. "attempted" to swallow something. The Court will credit this fact as one that is favorable to Sanders Sr., but the Court also notes that this fact is not dispositive evidence that Eggleston actually saw Sanders Jr. swallow anything, nor is it evidence that he knew the identity of the thing that Sanders Jr. might have attempted to swallow, if such a thing existed at all.

[5] Sanders Sr. admits that the officers made these statements to each other "in recognition that it was unknown as to how much cocaine Mr. Sanders had ingested." (Doc. # 89 at 6.)

his speech was not slurred, and he did not appear to be agitated. He was alert, "oriented," and able to provide identity and other basic information to Eggleston, including locations, dates, and numbers. He did not complain of medical problems, show signs of medical distress, or request medical attention or treatment.[6]

Therefore, rather than take Sanders Jr. to the hospital to get his stomach pumped, Eggleston drove Sanders Jr. the two blocks to the Dothan City Jail for booking. About one hour had passed from the time Eggleston first stopped Sanders Jr. to the time Eggleston drove Sanders Jr. to the jail. During the short drive to the jail, Eggleston and Sanders Jr. were talking to each other, and Eggleston did not think that anything was wrong. But when they arrived at the jail's sally port, Eggleston noticed that Sanders Jr. was dazed and appeared to be in some kind of medical distress. Eggleston told the jail sergeant to call the paramedics, moved Sanders Jr. out of the patrol car, and took off the handcuffs. When the paramedics arrived about seven to ten minutes later, Eggleston informed them that he suspected that Sanders Jr. had taken drugs. The paramedics then transported Sanders Jr. to the hospital, where he died a few days later. The autopsy reports that the cause of Sanders Jr.'s death was "acute cocaine intoxication."

Sanders Sr. filed this suit on January 3, 2007. First, Sanders Sr. makes two claims against Eggleston under 42 U.S.C. § 1983 for the possible violation of Sanders Jr.'s constitutional rights: (1) a Fourteenth Amendment deliberate-indifference claim for Eggleston's failure to take Sanders Jr. to the hospital; and (2) a Fourth Amendment excessive-force claim for Eggleston's use of his taser on Sanders Jr. Second, Sanders Sr.

---

[6] Sanders Sr. admits in his deposition that he has no evidence to dispute these observations.

6

argues that the City is also liable under § 1983 because, according to Sanders Sr., the City's official policies and its failure to adequately train its police officers regarding medical emergencies and the use of force caused Eggleston to violate Sanders Jr.'s constitutional rights. Third, Sanders Sr. sues Eggleston and the City for an array of state-law torts, including wrongful death, assault and battery, and (perhaps) negligence.[7] In response, the defendants ask for summary judgment on several grounds. Most important of these grounds is that Eggleston is entitled to qualified immunity.

## IV. LEGAL STANDARD

Qualified immunity protects police officers acting within their discretionary authority from civil liability in § 1983 actions so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope*, 536 U.S. at 739 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When it is undisputed, as it is here, that the officers were acting within their discretionary authority, the burden is on the plaintiff to establish that qualified immunity is not appropriate. *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 n.2 (11th Cir. 2007).

---

[7] Sanders Sr.'s Second Amended Complaint (Doc. # 48) is not a model of clarity. Among other problems, Count II's heading says: "42 U.S.C. § 1983-Assault and Battery-Wrongful Death." Not only is this heading inconsistent with the text of Count II itself, which seeks damages under only Alabama state law, but it also contravenes the well-settled rule that plaintiffs may not use § 1983 to vindicate state-law causes of action like assault and battery. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106, 105–06 (1989) ("[Section 1983] provides a remedy 'against all form of official violation of *federally* protected rights.'" (emphasis added)); *Maine v. Thiboutot*, 448 U.S. 1, 4–8 (1980). Therefore, to the extent Count II means to use § 1983 to vindicate a right created by state law, the Court will dismiss it, and to the extent it means to use § 1983 to vindicate a federal right to be free from assault and battery by police officers, the Court will treat it as duplicative of the excessive-force claims.

There are two parts to the qualified-immunity analysis. First, a court must determine whether the facts, viewed in the light most favorable to the plaintiff, show that an officer's conduct amounted to a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court must decide whether the constitutional right that was violated was "clearly established" at the time. *Id.* Because "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," the court may begin its analysis with either of the two parts. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). If either of the parts is answered in the negative, the officer is entitled to qualified immunity. *Saucier*, 533 U.S. at 201.

For all of the issues presented in the defendants' motion other than qualified immunity, summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party meets its burden of presenting evidence showing there is no dispute of material fact or showing that the nonmoving party has failed to present any evidence in support of an element of its case on which it bears the ultimate burden of proof, *id.* at 322–23, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. If, after the nonmoving party has responded, there is still no genuine issue of material fact and the

8

moving party is entitled to judgment as a matter of law, the court must grant summary judgment. *See* Fed. R. Civ. P. 56(c).

## V. DISCUSSION

### A. § 1983 Deliberate-Indifference Claims

#### 1. Against Eggleston

Eggleston argues that he is entitled to qualified immunity on Sanders Sr.'s Fourteenth Amendment deliberate-indifference claim. The Court agrees.

To prevail on his Fourteenth Amendment claim, Sanders Sr. must prove that Sanders Jr. had an "objectively serious medical need" and that Eggleston "acted with deliberate indifference to that need." *Andujar*, 486 F.3d at 1203 (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)). An "objectively serious medical need" is one that is so obvious that even a layperson would recognize the need for medical treatment. *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008). To establish "deliberate indifference," Sanders Sr. must demonstrate that Eggleston (1) subjectively knew of a risk of serious harm; (2) disregarded that risk; and (3) in doing so, acted with more than gross negligence. *Id.* at 1331 (quoting *Bozeman*, 422 F.3d at 1272).

The Court finds that the evidence, when viewed in the light most favorable to Sanders Sr., does not prove that Eggleston was deliberately indifferent and therefore does not establish a constitutional violation for qualified-immunity purposes.

The Eleventh Circuit's opinion in *Burnette v. Taylor* compels this result. In *Burnette*, two officers arrested a stepson for breaking into his stepfather's house and stealing prescription medication. *Id.* at 1327. At the time of the arrest, the officers noticed that the

9

stepson appeared to be intoxicated: he had glassy eyes and dilated pupils, and his responses to their questions were slow. *Id.* at 1328. Also, the officers found a prescription bottle on the stepson that contained only a handful of pills even though the prescription had been filled just the day before. *Id.* Further, both officers knew that the stepson had a drug-abuse problem before they arrested him. When the stepfather reported the theft, he told one of the officers about the stepson's checkered history of drug abuse and about how his stepson was "strung out" on pills and other drugs. *Id.* The other officer already had personal knowledge that the stepson was a drug user who frequented an area of town in which a lot of drug trafficking took place. *Id.* Even though the officers knew about the stepson's drug-abuse problems and had observed signs of his intoxication, they did not take him to the hospital for medical attention. Rather, they took him to the county jail, where he died later that night from a drug overdose. *Id.* at 1328–29.

When the stepson's estate sued the arresting officers for deliberate indifference, the Eleventh Circuit found that these facts did not amount to a constitutional violation and held that "[t]he Constitution does not require an arresting officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." *Id.* at 1331. According to the Court, the plaintiff had not satisfied the knowledge requirement even though "[i]t was apparent to [the officers] that [the stepson] was under the influence of something." *Id.* at 1328. Specifically noting that the stepson had not requested medical attention, the Court explained that the mild physical symptoms the stepson exhibited, although consistent with drug intoxication, were not "necessarily indicative" that the stepson was suffering from a serious medical condition that required emergency medical attention.

10

*Id.* at 1330. Nor had either officer seen the stepson actually consume drugs—although they no doubt suspected that there was a very high likelihood that he done so—or known what quantity of drugs he had consumed or whether he had consumed enough drugs so as to create a serious medical need. *Id.* Therefore, the Court concluded that the record, when viewed in the light most favorable to the plaintiff, did not show that "either [officer] knew or suspected [that the stepson] had ingested . . . a potentially lethal combination of drugs." *Id.* at 1331.

The Court find that the facts of this case fall within the holding of *Burnette*. A comparison of the facts of the two cases shows that Eggleston had no more actual knowledge of a serious medical condition than did the officers in *Burnette*. First, Sanders Jr. did not exhibit any outward signs of intoxication until his arrival at the jail, at which time Eggleston promptly called for medical attention. And even had Sanders Jr. appeared to be impaired, under the holding in *Burnette*, that knowledge of impairment would not satisfy the deliberate-indifference knowledge requirement. *Id.* Second, Eggleston did not have any knowledge at the time of the arrest about Sanders Jr.'s drug problems or his proclivity to abuse illegal drugs, and the reason for the traffic stop was not drug related. Third, as in *Burnette*, Sanders Jr. did not request medical attention or inform Eggleston that he had swallowed cocaine. In fact, when asked by Eggleston and Hall if he had swallowed cocaine, Sanders Jr. specifically denied it multiple times. Fourth, there is no evidence in the record that Eggleston actually saw Sanders Jr. put something in his mouth and swallow it. And even had Eggleston seen Sanders Jr. ingest something, the record is similarly devoid of any evidence proving that Eggleston actually knew that that something was cocaine or was enough cocaine to create

11

a serious medical need. Given these circumstances, *Burnette* instructs this Court to find that Eggleston did not have subjective knowledge of a serious medical condition.

    Sanders Sr. points to evidence he claims shows that Eggleston knew that Sanders Jr. had ingested cocaine. Specifically, Sanders Sr. argues that (1) Eggleston knew that the white flakes around Sanders Jr.'s mouth were cocaine, and that (2) Eggleston and Hall discussed whether they should take Sanders Jr. to get his stomach pumped because he had likely swallowed cocaine. For the sake of argument, the Court references other similar evidence that Sanders Sr. could have also referenced but did not: (3) the video recording shows that Sanders Sr. might have swallowed something when he put his hands up to his face and mouth after reaching back into the car; (4) Eggleston knew that suspects often conceal contraband and other evidence in their mouths; and (5) Eggleston reported shortly after the incident that Sanders Jr. had "attempted" to swallow something right before Eggleston used his taser on him. While all of this evidence certainly shows that Sanders Jr. likely swallowed cocaine, that Eggleston should have known it, and that Eggleston probably connected the dots, this proof is insufficient. The *Burnette* test requires more: it requires proof of actual knowledge, and so Sanders Sr. must show something more than Eggleston's well-founded suspicion. None of the evidence in the record, including the above facts, are proof that Eggleston knew for a fact that Sanders Jr. had swallowed cocaine, much less that he knew he had swallowed enough cocaine to require medical treatment.

    By contrast, when Eggleston noticed at the jail's sally port that Sanders Jr. was in medical distress, Eggleston reacted swiftly and appropriately by directing the jail sergeant

to call the paramedics. There is no evidence in the record that Eggleston actually knew of the serious nature of Sanders Jr.'s condition before this moment.

Sanders Sr. also seeks to distinguish this case from *Burnette* by calling attention to the officers' statements to Sanders Jr. that they knew he had swallowed cocaine and that they were going to take him to get his stomach pumped. But the officers made these statements in the course of a conversation designed to elicit an admission from Sanders Jr. that he had swallowed cocaine. As the defendants persuasively argue in their reply, this is no different than the situation in which an officer tells a suspect that he knows that the suspect has committed a crime in order to get the suspect to confess to the crime voluntarily. Consequently, the Court does not believe that it would be justifiable to infer actual knowledge from the officers' statements.

Moreover, Sanders Sr.'s attempt to distinguish the facts of this case from the facts of *Burnette* reveal a basic misunderstanding about the proof that is required to establish deliberate indifference. It is not enough for a plaintiff to prove that an officer knew that a person in police custody actually ingested drugs or was actually intoxicated by drugs. Instead, the plaintiff must prove that the officer knew that such ingestion or intoxication constituted or would cause an objectively serious medical need. This is the meaning of the Eleventh Circuit's holding in *Burnette* that the Constitution does not require an officer to provide medical assistance to every arrestee who appears to be affected by drugs. Police officers pull over and arrest countless suspects every day who either appear or are confirmed to be intoxicated. It is ridiculous to suggest, as Sanders Sr. seems to do, that these officers must obtain medical treatment for intoxicated suspects on the basis of the mere act of

13

ingestion of drugs or the fact of intoxication alone. Rather, the clear holding of *Burnette* is that the officer must also know that such ingestion or intoxication, based on the officer's knowledge of the amount of drugs ingested or the manifestation of the outward signs of intoxication, is serious enough to warrant medical treatment. Therefore, even assuming that Eggleston knew Sanders Jr. had actually taken drugs and was intoxicated, Eggleston is nonetheless protected by *Burnette* because there is no evidence in the record that Eggleston knew that Sanders Jr. had swallowed an amount of cocaine that could be potentially life threatening.

Accordingly, the Court finds that Sanders Sr. has failed to show Eggleston's deliberate indifference and therefore cannot establish a constitutional violation for qualified-immunity purposes. Summary judgment is appropriate.

### 2. Against the City of Dothan

Because this Court finds that Sanders Sr. has failed to establish that Eggleston violated Sanders Jr.'s Fourth Amendment rights, it logically follows that Sanders Sr. is foreclosed from proving that the City's official policies or its failure to train its employees caused Eggleston to violate Sanders Jr.'s Fourth Amendment rights. See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978). Therefore, this Court will grant summary judgment on all of the claims made against the City that are founded on Eggleston's alleged deliberate indifference.

### B. § 1983 Excessive-Force Claims

### 1. Against Eggleston

Eggleston argues that he is entitled to qualified immunity on Sanders Sr.'s Fourth

Amendment excessive-force claim.  The Court agrees.

When a plaintiff claims that an officer used excessive force in the course of an arrest, the question for the court is whether the officer's conduct was "objectively reasonable" in light of the situation confronting the officer.  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *see also Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).  In determining whether an officer's use of force was reasonable, a court should consider: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, (3) the extent of the injury inflicted, and (4) whether the force was applied in good faith or maliciously and sadistically."  *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).  A court should also consider "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight."  *Lee*, 284 F.3d at 1198 (quoting *Graham*, 490 U.S. at 396).

Under the Eleventh Circuit case law applying these factors, this case defies easy categorization.  It is not a case where an officer used a taser to subdue an unruly or dangerous suspect.  *See, e.g.*, *Zivonjinovich v. Barnes*, 525 F.3d 1059 (11th Cir. 2008), *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), *Bash v. Patrick*, 208 F. Supp. 2d 1285 (M.D. Ala. 2009) (Fuller, C.J.) (all holding that the use of force in such situations is not excessive).  Nor is it a case where an officer used force against a fully secured and obedient arrestee for no legitimate law-enforcement purpose.  *See, e.g.*, *Hadley*, 526 F.3d 1324; *Vinyard v. Wilson*, 311 F.3d 1341 (11th Cir. 2002); *Lee*, 284 F.3d 1188, *Slicker v. Jackson*, 215 F.3d 1225 (11th Cir. 2000) (all holding that the use of force in such situations is excessive).

15

Rather, this case falls somewhere in between, and it raises a novel question: When a fully secured arrestee is disobeying an officer's orders and, as a result, is preventing the completion of a justifiable law-enforcement activity (such as a search for contraband incident to arrest), is it constitutional for the officer to use his taser (for a short period of time, after sufficient warning, and without injury) to compel the arrestee to comply with his orders, even though the arrestee has not committed a serious crime, is not an immediate threat to any person's safety, and is not actively resisting arrest or attempting to flee? In other words, is compliance alone ever a constitutionally acceptable reason to use a taser on a fully secured arrestee?

After a careful review of Eleventh Circuit precedent, this Court finds that the constitutional inquiry presented in this case is not one that the Eleventh Circuit has ever squarely addressed and answered. Under the "clearly established" prong of the qualified-immunity analysis, police officers are entitled to immunity from suit "unless the law pre-existing the [officer]'s supposedly wrongful act was already established to such a high degree that every reasonable officer in the [officer]'s place would be on notice that what the [officer] was doing would be clearly established given the circumstances." *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002). This "clearly established" requirement protects "all but the plainly incompetent or those who knowingly violate the law." *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To show that the law was clearly established in a case like this one "where the applicable legal standard is a highly general one, such as 'reasonableness,' preexisting caselaw that has applied general law to specific circumstances will almost always be necessary to draw a line

16

that is capable of giving fair and clear notice that an official's conduct will violate federal law." *Thomas v. Roberts*, 323 F.3d 950, 959 (11th Cir. 2003) (citing *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1031 n.9 (11th Cir. 2001) (en banc)).  If an earlier case is "fairly distinguishable from the circumstances facing a government official," then that case cannot "clearly establish the law for the circumstances facing that government official." *Vinyard*, 311 F.3d at 1352.

Sanders Sr. cites to four Eleventh Circuit cases[8] for the proposition that, at the time of the incident, "it was clearly established law in this circuit that a police officer violates a citizen[']s constitutional rights by subjecting them [sic] to unnecessary force while that person is handcuffed and in the custody and control of that officer." (Doc. # 89 at 36.) Sanders Sr. is correct that this is the holding of the line of cases to which he cites, but neither this holding nor the facts of the four cases are on point.  In each of the cases, officers used force on arrestees without cause or reason in situations where the arrestees were not resisting arrest or refusing to comply with the officers' orders.  Thus, as this Court has already explained, this line of cases holds that the use of force against a fully secured and *obedient* arrestee for *no legitimate* law-enforcement purpose is unconstitutionally excessive.  By contrast, the issue in this case is whether the use of force against a fully secured yet *disobedient* arrestee for a *legitimate* law-enforcement purpose is unconstitutionally excessive. As the Eleventh Circuit has stated, referring to *Lee* and cases like it: "The use of force in *Lee* was wholly uncalled for; *Lee* decides nothing about the gamut of options for force usage in

---

[8] Sanders Sr. has cited to: *Vinyard*, 311 F.3d 1341; *Lee*, 284 F.3d 1188; *Slicker*, 215 F.3d 1225; and *Smith v. Maddox*, 127 F.3d 1416 (11th Cir. 1997).

17

the circumstances of arrestee intransigence." *Buckley v. Haddock*, 292 F. App'x 791 (11th Cir. 2008). Thus, the cases to which Sanders Sr. cites do not reach the factual particulars of this case.

The Court can find no other case that would support Sanders Sr.'s position that the right of Sanders Jr. that Eggleston may have violated was clearly established at the time. Further, Eggleston's use of force on Sanders Jr. was not so obviously excessive, sadistic, or malicious as to violate the Fourth Amendment on its face. *Cf., e.g.*, *Priester*, 208 F.3d 919; *Estate of Gilliam ex rel. v. City of Prattville*, No. 2:08-cv-278, 2009 WL 3586949 (M.D. Ala. 2009) (Fuller, C.J.).

Therefore, this Court finds that the constitutional question presented by the facts of this case remains open for decision. Even if this Court were to "slosh [its] way through the factbound morass of 'reasonableness'" and identify a violation of Sanders Jr.'s constitutional rights, *see Scott*, 550 U.S. at 383, Eggleston would nonetheless be entitled to qualified immunity because that right was not clearly established. This Court has the authority under *Pearson* to dispose of this claim on this basis alone, see 129 S. Ct. at 818, and it will choose to do so in the absence of clearer guidance from the Eleventh Circuit on the parameters of Sanders Jr.'s constitutional rights under the Fourth Amendment. Accordingly, Eggleston is entitled to qualified immunity, and by extension, summary judgment on this claim.

### 2. Against the City of Dothan

Sanders Sr. did not respond to the defendants' motion for summary judgment on the excessive-force claims against the City.

18

> [I]n opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (internal citations and quotation marks omitted). Here, Sanders Sr. did not respond, and therefore, he has abandoned his excessive-force claims against the City. Therefore, the Court will grant summary judgment on Sanders Sr.'s excessive-force claims against the City.

### C. State-Law Claims

All of the federal claims over which this Court had original jurisdiction have now been resolved against Sanders Sr. Therefore, under 28 U.S.C. § 1367(c)(3), this Court declines to exercise supplemental jurisdiction over Sanders Sr.'s remaining state-law claims. Accordingly, the Court will dismiss Sanders Sr.'s claims under Alabama law without prejudice. This dismissal should not work to Sanders Sr.'s disadvantage should he elect to bring suit in state court because the period of limitations for his state-law claims tolls during the pendency of this action. *See* 28 U.S.C. § 1367(d).

### VI. CONCLUSION

Therefore, for the foregoing reasons, it is hereby ORDERED as follows:

1.      Defendants City of Dothan and Maurice Eggleston's Motion for Summary Judgment (Doc. # 68), filed on August 14, 2009, is GRANTED as to all federal claims, and those claims are DISMISSED WITH PREJUDICE

2. Defendants City of Dothan and Maurice Eggleston's Motion for Summary Judgment (Doc. # 68), filed on August 14, 2009, is DENIED as to all state claims, and those claims are DISMISSED WITHOUT PREJUDICE.

3. All other pending motions in this cause are DENIED as MOOT.

DONE this the 30th day of November, 2009.

                                                        /s/ Mark E. Fuller
                                          CHIEF UNITED STATES DISTRICT JUDGE